**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

———————————————————————— x

Douglas White, individually and on
behalf of all others similarly situated,

                      Plaintiff,

v.

Tom's of Maine, Inc.,

                      Defendant.

———————————————————————— x

:
:
:   Case No. 1:25-cv-00662-OEM-LKE
:
:
:
:
:   **FIRST AMENDED**
:   **CLASS ACTION COMPLAINT**
:
:   **JURY TRIAL DEMANDED**
:
:
:

Plaintiff, Douglas White (hereinafter "Plaintiff"), individually and on behalf of all others similarly situated, by his attorneys, alleges the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on personal knowledge:

## NATURE OF THE ACTION

1. This action seeks to remedy the deceptive and misleading business practices of Tom's of Maine, Inc. (hereinafter "Defendant") with respect to the manufacturing, marketing, and sale of Defendant's Tom's of Maine, Inc.'s Kid's Natural Fluoride-Free Toothpaste Silly Strawberry and Tom's of Maine, Inc's Toddler Natural Fluoride-Free Toothpaste Mild Fruit products throughout the state of New York and throughout the country (hereinafter the "Products").

2. Defendant has improperly, deceptively, and misleadingly labeled and marketed their Products to reasonable consumers, like Plaintiff, by omitting and not disclosing to consumers on their packaging that the Products are contaminated with unsafe levels of lead and/or arsenic,

1

which are powerful neurotoxins that are known to cause cognitive deficits, mental illness, dementia, and hypertension.

3.     The Products' contamination is particularly egregious given the potentially severe and irreversible consequences of lead and/or arsenic consumption.

4.     Defendant specifically lists the ingredients of the Products on the labeling; however, Defendant fails to disclose that the Products contain lead and/or arsenic.

5.     A few representative examples of Defendant's lack of disclosure on the Products are depicted below:





6.    Lead is a powerful neurotoxin.  There is no safe blood level of lead.[1]  Lead consumption has been shown to reduce intelligence, and to increase the risk of mental illness, dementia, hypertension, arrhythmia, and breast cancer.[2]

7.    Defendant egregiously omits the presence of arsenic in its Products when "children are particularly vulnerable to the potential harmful effects from arsenic exposure because of their smaller body sizes and rapid metabolism and growth."[3]

8.    Consumers like the Plaintiff trust manufacturers such as Defendant to sell products that are safe and free from harmful known substances, including lead and/or arsenic.

9.    Plaintiff and those similarly situated (hereinafter "Class Members") certainly expect that the oral care products they purchase will not contain, or risk containing, any knowingly harmful substances that cause life threatening harm.

10.    Unfortunately for consumers, like Plaintiff, the Products they purchased contained, or were at risk of containing, lead and/or arsenic.

11.    Independent testing has detected the presence of lead and/or arsenic in the Products.

12.    This testing includes, but is not limited to, testing conducted by the consumer and Products safety advocacy group Lead Safe Mama which has confirmed and demonstrated the presence of *lead* and *arsenic* in the Tom's of Maine, Inc.'s Kid's Natural Fluoride-Free Toothpaste Silly Strawberry product and *lead* in the Tom's of Maine, Inc.'s Toddler Natural Fluoride-Free

---

[1] *CDC – Lead – Tips – Sources of Lead – Folk Medicine*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Oct. 15, 2013), http://www.cdc.gov/nceh/lead/tips/folkmedicine.htm.
[2] Maryse F. Bouchard, PhD et al., *Blood Lead Levels and Major Depressive Disorder, Panic Disorder, and Generalized Anxiety Disorder in US Young Adults*, 66 ARCHIVES OF GENERAL PSYCHIATRY 1313, 1317 (Dec 2009); Marc G. Weisskopf et al., *Cumulative Lead Exposure and Prospective Change in Cognition Among Elderly Men*, 160 AMERICAN JOURNAL OF EPIDEMIOLOGY 1184, 1185, 1188, 1190-91 (2004); Olusegun I. Alatise, Gerhard N. Schrauzer, *Lead Exposure:  A Contributing Cause of the Current Breast Cancer Epidemic in Nigerian Women*, BIOLOGICAL TRACE ELEMENT RESEARCH 127, 138 (Mar. 3, 2010).
[3] https://www.fda.gov/food/environmental-contaminants-food/arsenic-food

Toothpaste Mild Fruit at levels that are not only extremely elevated for adults, but staggeringly much more dangerous for children.[4]

13.    Moreover, children are known to innocently consume toothpaste by Defendant, even prompting Defendant to include a bulletin on their website highlighting this.[5] In fact, Defendant attempts to mitigate the inherent risks associated with the consumption of toothpaste, which, in its uncontaminated form, poses certain dangers, and further exacerbates those risks when contaminated with neurotoxins such as lead and/or arsenic. Defendant omits from their website the extreme danger of children consuming toothpaste that has been contaminated with lead and/or arsenic.[6]

14.    Defendant is no stranger to contamination of their toothpaste products. Just recently in 2024 the FDA investigated and found other products sold by Defendant under the same brand name to have been contaminated with dangerous "mold-like" substances.[7]

15.    Defendant is using a marketing and advertising campaign that omits from the ingredients list that the Products contain lead and/or arsenic.  This omission leads a reasonable consumer to believe they are not purchasing  Products with a known neurotoxin when in fact they are purchasing  Products that are or may be contaminated with lead and/or arsenic.

16.    Defendant's marketing and advertising campaign includes the one place that every consumer looks when purchasing  Products – the packaging and labels themselves.  As such, a reasonable consumer reviewing Defendant's labels reasonably believes that they are purchasing Products that are safe for oral ingestion and do not contain any harmful neurotoxins.  Indeed,

---

[4] https://tamararubin.com/2025/02/toms-of-maine-kids-natural-fluoride-free-toothpaste-silly-strawberry/;
https://tamararubin.com/2025/04/toms-of-maine-fluoride-free-toddler-toothpaste-in-mild-fruit-flavor/
[5] https://www.colgate.com/en-us/oral-health/brushing-and-flossing/help-my-child-wants-to-eat-toothpaste
[6] *Id.*
[7] https://www.npr.org/2024/11/20/nx-s1-5197484/toms-toothpaste-mold-fda-inspection

consumers expect the ingredient listing on the packaging and labels to accurately disclose the ingredients within the Products.   Thus, reasonable consumers would not think that Defendant is omitting that the Products contains lead and/or arsenic.

17.    Defendant's advertising and marketing campaign is false, deceptive, and misleading because the Products do contain, or risk containing, lead and/or arsenic, which are dangerous to one's health and well-being.  Nevertheless, Defendant does not list or mention lead nor arsenic anywhere on the Products' packaging or labeling.

18.    Reasonable consumers, like Plaintiff, certainly expect the products they give their children to be free from lead and/or arsenic, substances known to have severe health consequences.

19.    Plaintiff and Class Members relied on Defendant's misrepresentations and omissions of the safety of the Products and what is in the Products when they purchased them.

20.    Consequently, Plaintiff and Class Members lost the entire benefit of their bargain when what they received were Products contaminated with known neurotoxins that are harmful to consumers' health.

21.    That is because Defendant's Products containing, or at risk of containing lead or arsenic, known dangerous substances, have no value.

22.    As set forth below, products, such as Defendant's Products, are in no way safe for human consumption and are entirely worthless.

23.    Alternatively, Plaintiff and Class Members paid a price premium for the Products based upon Defendant's marketing and advertising campaign including its false and misleading representations and omission on the Products' labels.  Given that Plaintiff and Class Members paid a premium for the Products, Plaintiff and Class Members suffered an injury in the amount of the premium paid.

24.     Accordingly, Defendant's conduct violated and continues to violate, *inter alia*, New York General Business Law §§ 349 and 350 and are liable for negligence per se and unjust enrichment.

25.     Plaintiff brings this action against Defendant on behalf of himself and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

## FACTUAL BACKGROUND

26.     Defendant manufactures, markets, advertises, and sells consumer products.

27.     Consumers have become increasingly concerned about the effects of ingredients in products that they orally ingest.  Companies, such as Defendant, have capitalized on consumers' desire for safe products, and indeed, consumers are willing to pay, and have paid, a premium for these products.

28.     Consumers lack the meaningful ability to test or independently ascertain or verify whether Products contain unsafe substances, such as lead or arsenic, especially at the point of sale, and therefore must and do rely on Defendant to truthfully and honestly report what the Products contain or are at risk of containing on the Products' packaging or labels.

29.     Independent testing indicates the presence of *lead and arsenic* in the Tom's of Maine, Inc.'s Kid's Natural Fluoride-Free Toothpaste Silly Strawberry product and *lead* in the Tom's of Maine, Inc.'s Toddler Natural Fluoride-Free Toothpaste Mild Fruit at dangerous levels, especially to the children the Products' advertising focuses on.[8]

30.     In addition, Plaintiff has commissioned independent testing on the Tom's of Maine, Inc.'s Kid's Natural Fluoride-Free Toothpaste Silly Strawberry product he actually purchased.

---

[8] https://tamararubin.com/2025/02/toms-of-maine-kids-natural-fluoride-free-toothpaste-silly-strawberry/;
https://tamararubin.com/2025/04/toms-of-maine-fluoride-free-toddler-toothpaste-in-mild-fruit-flavor/

Testing was conducted in April, 2025 by SGS North America, Inc. in Harrisburg, Pennsylvania utilizing AOAC 2015.01 methodology. This testing detected lead in the product purchased by Plaintiff at .455 mg/Kg, or 455 parts per billion.  In addition, this testing detected arsenic in the product purchased by Plaintiff at .068 mg/Kg or 68 parts per billion.  These results align with and, in fact, exceed the levels detected by other publicly reported independent tests.

31.    Defendant specifically markets the Products to appeal to children by using their labeling and marketing campaign to claim the Products are each healthy toothpastes for kids. A representative example of Defendant's marketing of the Products to appeal to children can be seen below:



32.    The Products' packaging does not identify lead or arsenic.  Indeed, lead and arsenic are not listed in the ingredients section, nor is there any warning about the inclusion (or even potential inclusion) of lead or arsenic in the Products.   This leads reasonable consumers to believe that the Products do not contain, and are not at risk of containing, lead or arsenic.

33.    However, both Products contain lead and the Kid's Natural Fluoride-Free Toothpaste Silly Strawberry product also contains arsenic.

34.    Lead is a powerful neurotoxin.   There is no safe blood level of lead.[9]   Lead consumption has been shown to reduce intelligence, and to increase the risk of mental illness, dementia, hypertension, arrhythmia, and breast cancer.[10]

35.    This is true even at low levels of lead consumption.[11]   For example, research has shown that an increase of only 0.3 micrograms/deciliter of median blood lead levels is associated with a doubling of the risk for panic disorder.[12]   People exposed to low levels of lead lose an average of 1.37 IQ points per 1 microgram/deciliter increase in blood lead concentration.[13] Ingested lead accumulates in the bones and brain and can cause health problems even decades

---

[9] *CDC – Lead – Tips – Sources of Lead – Folk Medicine*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Oct. 15, 2013), http://www.cdc.gov/nceh/lead/tips/folkmedicine.htm.
[10] Maryse F. Bouchard, PhD et al., *Blood Lead Levels and Major Depressive Disorder, Panic Disorder, and Generalized Anxiety Disorder in US Young Adults*, 66 ARCHIVES OF GENERAL PSYCHIATRY 1313, 1317 (Dec 2009); Marc G. Weisskopf et al., *Cumulative Lead Exposure and Prospective Change in Cognition Among Elderly Men*, 160 AMERICAN JOURNAL OF EPIDEMIOLOGY 1184, 1185, 1188, 1190-91 (2004); Olusegun I. Alatise, Gerhard N. Schrauzer, *Lead Exposure:  A Contributing Cause of the Current Breast Cancer Epidemic in Nigerian Women*, BIOLOGICAL TRACE ELEMENT RESEARCH 127, 138 (Mar. 3, 2010).
[11] *Id*.
[12] Bouchard, *supra*, at 1317.
[13] Richard L. Canfield, Ph.D et al., *Intellectual Impairments in Children with Blood Lead Concentrations Below 10 Micrograms per Deciliter*, THE NEW ENGLAND JOURNAL OF MEDICINE 1517, 1521 (April 17, 2003)

later.[14]  Chronic low dose exposure to lead is believed to be associated with cognitive decline and dementia in older adults.[15]

36.    Children are at especially high risk of developing adverse effects from lead and arsenic exposure due to their developing brains, and because, compared to adults, less lead and arsenic are stored by the body in bones and teeth and more in the nervous system.[16]

37.    "Even low levels of lead in blood have been shown to affect a child's learning capacity, ability to pay attention, and academic achievement. "Children are particularly vulnerable to the potential harmful effects from arsenic exposure because of their smaller body sizes and rapid metabolism and growth."[17] The effects of lead and arsenic exposure can be permanent."[18]

38.    "CDC currently uses a blood lead reference value (BLRV) of 3.5 micrograms per deciliter to identify children with blood lead levels that are higher than most children's levels.  This level is based on the on the 97.5th percentile of the blood lead values among U.S. of children ages 1-5 years from the 2015-2016 and 2017-2018 National Health and Nutrition Examination Survey (NHANES) cycles.  Children with blood lead levels at or above the BLRV are among the top 2.5% of U.S. children with the highest blood lead levels."[19]

---

[14] Marc G. Weisskopf et al., *Cumulative Lead Exposure and Prospective Change in Cognition Among Elderly Men*, 160 AMERICAN JOURNAL OF EPIDEMIOLOGY 1184, 1185, 1188, 1190-91 (2004); Jennifer Weuve et al., *Cumulative Exposure to Lead in Relation to Cognitive Function in Older Women*, 117 ENVIRONMENTAL HEALTH PERSPECTIVES 574, 578 (April 2009).

[15] Marc G. Weisskopf et al., *Cumulative Lead Exposure and Prospective Change in Cognition Among Elderly Men*, 160 AMERICAN JOURNAL OF EPIDEMIOLOGY 1184, 1185, 1188, 1190-91 (2004); Jennifer Weuve et al., *Cumulative Exposure to Lead in Relation to Cognitive Function in Older Women*, 117 ENVIRONMENTAL HEALTH PERSPECTIVES 574, 578 (April 2009); Bouchard, *supra*, at 1318.

[16] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1314903/

[17] https://www.fda.gov/food/environmental-contaminants-food/arsenic-food

[18] https://www.cdc.gov/nceh/lead/docs/lead-levels-in-children-fact-sheet-508.pdf

[19] https://www.cdc.gov/nceh/lead/prevention/blood-lead-levels.htm

39.    Children found to have a blood lead level greater than 3.5 µg/dL should be reported to state and local health departments which may prompt an investigation of the child's home and environment and regular monitoring.[20]

40.    Children found to have blood levels greater than 20 µg/dL are put on more advanced treatments, including abdominal x-ray, bowel decontamination, chelation therapy, or even admission to a hospital.[21]

41.    Children found to have lead and/or arsenic in their blood are recommended to have their levels monitored and potentially enroll in various treatments, including feeding the child a diet high in iron and calcium, x-rays, and chelation therapy to remove lead and/or arsenic from their blood.

42.    Defendant is a large and sophisticated corporation that has been in the business of producing, manufacturing, selling, and distributing consumer products for many years, including producing and manufacturing the contaminated Products.

43.    Defendant is in the unique and superior position of knowing the ingredients and raw materials used in the manufacturing of its Products and possess unique and superior knowledge regarding the manufacturing process of the Products, the manufacturing process of the ingredients and raw materials the Products contain, and the risks associated with those processes, such as the risk of lead and/or arsenic contamination, as well as the ability to test the Products for contamination prior to releasing the Products into the stream of commerce.

44.    Accordingly, Defendant possess superior knowledge regarding the risks involved in the production and manufacturing of its Products.

---

[20] https://www.cdc.gov/nceh/lead/advisory/acclpp/actions-blls.htm
[21] *Id.*

45.    The fact that the Products are contaminated with lead and/or arsenic is not information that is reasonably accessible to Plaintiff and the class members.  The only possible way for Plaintiff and the Class Members to obtain such information would be to conduct their own independent testing prior to purchasing the Products.   No reasonable consumer commissions laboratory testing before purchasing toothpaste.

46.    Defendant has a duty to provide consumers, like Plaintiff and Class Members, with accurate information about the contents of the Products.

47.    Therefore, Defendant's false, misleading, and deceptive omissions regarding the Products containing lead and/or arsenic is likely to continue to deceive and mislead reasonable consumers and the public, as they have already deceived and misled Plaintiff and the Class Members.

48.    Defendant's misrepresentations and omissions were material and intentional because people are concerned with what is in the products that they orally ingest.  Consumers such as Plaintiff the Class Members are influenced by the marketing and advertising campaign, the Products' labels, and the listed ingredients.  Defendant knew that if they had not omitted that the Products contains lead and/or arsenic, then Plaintiff and the Class would not have purchased the Products at all.

49.    Consumers rely on marketing and information in making purchasing decisions.

50.    By omitting that the Products includes lead and/or arsenic on the labels of the Products throughout the Class Period, Defendant knew that those omissions are material to consumers since they would not purchase  Products with  harmful neurotoxins such as lead and/or arsenic.

51.     Defendant's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

52.     Plaintiff and the Class Members reasonably relied to their detriment on Defendant's misleading representations and omissions.

53.     Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled Plaintiff and the Class Members.

54.     In making the false, misleading, and deceptive representations and omissions described herein, Defendant knew and intended that consumers would pay a premium for Products marketed without lead and arsenic over comparable products not so marketed.

55.     As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representation and omission, Defendant injured Plaintiff and the Class Members in that they:

a.     Paid a sum of money for Products that were not what Defendant represented;

b.     Paid a premium price for Products that were not what Defendant represented;

c.     Were deprived of the benefit of the bargain because the Products they purchased were different from what Defendant warranted;

d.     Were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendant represented;

e.     They ingested substances that were of a different quality than what Defendant promised; and

f.     Were denied the benefit of the properties of the Products Defendant promised.

53.     Had Defendant not made the false, misleading, and deceptive representations and omissions, Plaintiff and the Class Members would not have been willing to pay the same amount for the Products they purchased and, consequently, Plaintiff and the Class Members would not have been willing to purchase the Products.

54.     Plaintiff and the Class Members paid for  Products that do not contain lead and/or arsenic.  Since the Products do indeed contain lead and/or arsenic, harmful neurotoxins, the Products Plaintiff and the Class Members received were worth less than the Products for which they paid.

55.     Plaintiff and the Class Members all paid money for the Products; however, Plaintiff and the Class Members did not obtain the full value of the advertised Products due to Defendant's misrepresentations and omissions.  Plaintiff and the Class Members purchased, purchased more of, and/or paid more for, the Products than they would have had they known the truth about the Products.   Consequently, Plaintiff and the Class Members have suffered injury in fact and lost money as a result of Defendant's wrongful conduct.

56.     Plaintiff and Class Members read and relied on Defendant's representations about the Products and purchased Defendant's Products based thereon.  Had Plaintiff and Class Members known the truth about the Products, i.e., that they contain harmful neurotoxins (i.e. lead and arsenic), they would not have been willing to purchase them at any price, or, at minimum, would have paid less for them.

**JURISDICTION AND VENUE**

57.     This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. section §1332(d) in that (1) this is a class action involving more than 100 class members;

16

(2) Plaintiff is a citizen of New York and Defendant Tom's of Maine, Inc. is a citizen of Maine; and (3) the amount in controversy is in excess of $5,000,000, exclusive of interests and costs.

58.     This Court has personal jurisdiction over Defendant because Defendant conducts and transacts business in the state of New York, contracts to supply goods within the state of New York, and supplies goods within the state of New York.

59.     Venue is proper because Plaintiff and many Class Members reside in the Eastern District of New York, and throughout the state of New York.  A substantial part of the events or omissions giving rise to the Classes' claims occurred in this district.

## PARTIES

**Plaintiff**

60.     Plaintiff is a citizen and resident of Staten Island, New York.  During the applicable statute of limitations period, Plaintiff purchased the Products on multiple occasions from brick-and-mortar stores located in Staten Island and gave his child Defendant's Products, that contained lead and arsenic.   More specifically, in January 2025 Plaintiff purchased the Tom's of Maine, Inc.'s Natural Fluoride-Free Toothpaste in Silly Strawberry Flavor Product in Staten Island, New York.

61.     Had Defendant not made the false, misleading, and deceptive representations and omissions regarding the contents of the Products, Plaintiff would not have been willing to purchase the Products.   Plaintiff purchased, purchased more of, and/or paid more for, the Products than he would have had he known the truth about the Products.    The Products Plaintiff received were worthless because they contained the known harmful neurotoxins, lead and arsenic.  Alternatively, Plaintiff paid a price premium based on Defendant's false, misleading, and deceptive misrepresentations and omissions.  Accordingly, Plaintiff was injured in fact and lost money as a

result of Defendant's improper conduct.

**Defendant**

62.    Defendant, Tom's of Maine, Inc. is a Maine company with its principal place of business in Kennebunk, Maine.

63.    Defendant manufactures, markets, advertises, and distributes the Products throughout the United States.  Defendant created and/or authorized the false, misleading, and deceptive advertisements, packaging, and labeling of its Products.

## CLASS ALLEGATIONS

64.    Plaintiff brings this matter on behalf of himself and those similarly situated.  As detailed at length in this Complaint, Defendant orchestrated deceptive marketing and labeling practices.  Defendant's customers were uniformly impacted by and exposed to this misconduct.  Accordingly, this Complaint is uniquely situated for class-wide resolution.

65.    The Class is defined as all consumers who purchased the Products anywhere in the United States during the Class Period.

66.    Plaintiff also seeks certification, to the extent necessary or appropriate, of a subclass of individuals who purchased the Products in the state of New York at any time during the Class Period (the "New York Subclass").

67.    The Class and New York Subclass are referred to collectively throughout the Complaint as the Class.

68.    The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

69.    <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable.  Plaintiff believes that there are thousands of consumers in the Class and the New York Class who are Class Members as described above who have been damaged by Defendant's deceptive and misleading practices.

70.    <u>Commonality</u>: The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

a.    Whether Defendant was responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;

b.    Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant has engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of its Products;

c.    Whether Defendant made false and/or misleading statements and omissions to the Class and the public concerning the contents of its Products;

d.    Whether Defendant's false and misleading statements and omissions concerning its Products were likely to deceive the public; and

e.    Whether Plaintiff and the Class are entitled to money damages under the same causes of action as the other Class Members.

71.    <u>Typicality</u>: Plaintiff is a member of the Class.  Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased Defendant's Products.   Plaintiff is entitled to relief under the same causes of action as the other Class Members.

19

72.    <u>Adequacy</u>: Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the Class Members he seeks to represent, his consumer fraud claims are common to all members of the Class, he has a strong interest in vindicating his rights, he has retained counsel competent and experienced in complex class action litigation, and counsel intends to vigorously prosecute this action.

73.    <u>Predominance</u>: Pursuant to Rule 23(b)(3), common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class.  The Class issues fully predominate over any individual issues because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's deceptive and misleading marketing and labeling practices.

74.    <u>Superiority</u>: A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

   a.   The joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

   b.   The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claims, thereby making it impracticable, unduly burdensome, and expensive—if not totally impossible—to justify individual actions;

   c.   When Defendant's liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d. This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude their maintenance as a class action;

f. This class action will assure uniformity of decisions among Class Members;

g. The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

h. Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by a single class action; and

i. It would be desirable to concentrate in this single venue the litigation of all Class Members who were induced by Defendant's uniform false advertising to purchase its Products.

75. Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## CLAIMS

### FIRST CAUSE OF ACTION
### VIOLATION OF NEW YORK GBL § 349
**(On Behalf of Plaintiff and New York Subclass Members)**

76. Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

77. New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . .."

78. The conduct of Defendant alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiff and the New York Subclass Members seek monetary damages against Defendant.

79. There is no adequate remedy at law.

80. Defendant misleadingly, inaccurately, and deceptively advertises and markets its Products to consumers.

81. Defendant's improper consumer-oriented conduct—including failing to disclose that the Products contain lead and/or arsenic—is misleading in a material way in that it, *inter alia*, induced Plaintiff and the New York Subclass Members to purchase Defendant's Products and to use the Products when they otherwise would not have. Defendant made the untrue and/or misleading statements and omissions willfully, wantonly, and with reckless disregard for the truth.

82. Plaintiff and the New York Subclass Members have been injured inasmuch as they purchased Products that were mislabeled, unhealthy, and entirely worthless. Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and paid for.

83. Defendant's advertising and Products' packaging and labeling induced Plaintiff and the New York Subclass Members to buy Defendant's Products.

84. Defendant's deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff and the New York Subclass Members have been damaged thereby.

22

85.     As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and the New York Subclass Members are entitled to monetary, statutory, and compensatory damages, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

### SECOND CAUSE OF ACTION
### VIOLATION OF NEW YORK GBL § 350
### (On Behalf of Plaintiff and the New York Subclass Members)

86.     Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

87.     N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

> False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

88.     N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

> The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

89.     Defendant's labeling and advertisements contain untrue and materially misleading statements and omissions concerning its Products inasmuch as it misrepresents that the Products are safe for use and doesn't list that the Products contain lead and/or arsenic.

90.     Plaintiff and the New York Subclass Members have been injured inasmuch as they relied upon the labeling, packaging, and advertising and purchased Products that were mislabeled,

unhealthy, and entirely worthless.  Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and paid for.

91.    Defendant's advertising, packaging, and Products' labeling induced Plaintiff and the New York Subclass Members to buy Defendant's Products.

92.    Defendant made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

93.    Defendant's conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

94.    Defendant made the material misrepresentations described in this Complaint in its advertising and on the Products' packaging and labeling.

95.    Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.  Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

96.    As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and New York Subclass Members are entitled to monetary, statutory, and compensatory damages, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the New York Subclass Members)**

97.    Plaintiff repeats and re-alleges each and every allegation contained in all the foregoing paragraphs as if set fully set forth herein.

98.     Violation of a statute constitutes per se negligence where it can be shown that Plaintiff belongs to the class of legislatively intended beneficiaries and that a right of action would be clearly in furtherance of the legislative purpose.

99.     Defendant is liable for negligence per se due to its violations of the Food Drug and Cosmetics Act as described herein.

100.    The FDA considers toothpaste which lacks fluoride to be a "cosmetic."[22]

101.    21 U.S.C. § 331 prohibits the "adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce."

102.    Pursuant to 21 U.S.C. § 361, a cosmetic is considered adulterated if it "bears or contains any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling thereof."

103.    Pursuant to 21 U.S.C. § 361, a cosmetic is considered misbranded if "its labeling is false or misleading in any particular."

104.    The Products are "adulterated" because they each contain lead and/or arsenic which are injurious to health.

105.    The Products are "misbranded" because their labeling is false and misleading in that they omit any mention or warning of the fact that they contain or risk containing dangerous lead and/or arsenic.

106.    The FDCA is designed to protect consumers like Plaintiff from products which are adulterated with dangerous substances and misbranded.

107.    Accordingly, Defendant's violations of the FDCA statutes subject them to liability for negligence per se under New York law.

---

[22] https://www.fda.gov/industry/fda-basics-industry/are-all-personal-care-products-regulated-cosmetics

## FOURTH CAUSE OF ACTION
## UNJUST ENRICHMENT
### (On Behalf of Plaintiff and All Class Members)

108.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

109.    Plaintiff, on behalf of himself and consumers nationwide, brings a claim for unjust enrichment.

110.    Defendant's conduct violated, *inter alia*, state law by manufacturing, advertising, marketing, and selling its Products while misrepresenting and omitting material facts.

111.    Defendant's unlawful conduct as described in this Complaint allowed Defendant to knowingly realize substantial revenues from selling its Products at the expense of, and to the detriment or impoverishment of, Plaintiff and Class Members and to Defendant's benefit and enrichment.  Defendant has thereby violated fundamental principles of justice, equity, and good conscience.

112.    Plaintiff and Class Members conferred significant financial benefits and paid substantial compensation to Defendant for the Products, which were not as Defendant represented them to be.

113.    Accordingly, it is inequitable for Defendant to retain the benefits conferred by Plaintiff and Class Members' overpayments.

114.    Plaintiff and Class Members seek disgorgement of all profits resulting from such overpayments so that Plaintiff and Class Members may seek restitution.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment as follows:

(a) Declaring this action to be a proper class action and certifying Plaintiff as the representative of the Class under Rule 23 of the FRCP;

(b) Awarding monetary damages, restitution damages and treble damages;

(c) Awarding statutory damages of $50 per transaction, and treble damages for knowing and willful violations, pursuant to N.Y. GBL § 349;

(d) Awarding statutory damages of $500 per transaction pursuant to N.Y. GBL § 350;

(e) Awarding Plaintiff and Class Members their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys, experts, and reimbursement of Plaintiff's expenses; and

(f) Granting such other and further relief as the Court may deem just and proper.

Dated: May 22, 2025

**SULTZER & LIPARI, PLLC**

By:    */s/Philip J. Furia*

_____
Philip J. Furia, Esq.
Jason P. Sultzer, Esq.
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Tel: (845) 483-7100
Fax: (888) 749-7747
pfuria@thesultzerlawgroup.com
sultzerj@thesultzerlawgroup.com

*Counsel for Plaintiff and the Class*